COMMONWEALTH vs. ALBERT LITTLE.

Bristol. May 2, 1978. — August 25, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Evidence*, Contradiction of witness, State of mind. *Practice, Criminal*, Instructions to jury, Assistance of counsel.

There was no merit in a defendant's contention that his conviction of murder should be reversed because of certain remarks in the prosecutor's opening statement. [237–238]

At a criminal trial, the judge did not err in admitting prior inconsistent statements of two witnesses to impeach their credibility even though the witnesses were not given the opportunity to explain the inconsistencies where each witness denied having made the prior statement. [238]

At a murder trial, the judge did not err in allowing a witness to testify that two years earlier the defendant had pistol-whipped him as a lesson to the victim where the evidence was relevant to show the defendant's state of mind toward the victim. [238]

At a murder trial, there was sufficient evidence to warrant a finding that the defendant was guilty. [238]

At a criminal trial, there was no error in the judge's instructions to the jury relative to determining the credibility of witnesses and relative to the defendant's alibi defense, the Commonwealth's burden of proof, and evidence of consciousness of guilt. [239–240]

The record of a criminal case did not support the defendant's claim that he was denied effective assistance of counsel even though his trial counsel testified in support of the defendant's motion for a new trial that his personal problems and medication he had been taking interfered with his handling of the case. [240–242]

INDICTMENT found and returned in the Superior Court on June 30, 1975.

The case was tried before *Dwyer*, J.

*Barry H. Gerstein* for the defendant.

*Francis M. O'Boy*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant Albert Little was indicted for the murder of Normand Blanchette, who was found shot to death in New Bedford in the early morning hours of June 12, 1975. After a six-day trial in the Superior Court, a jury found Little guilty of murder in the first degree. The defendant's assignments of error are here pursuant to G. L. c. 278, §§ 33A-33G. We conclude that there was no error.

About 12:30 A.M. on June 12, 1975, police found Blanchette's body slumped in the driver's seat of a pickup truck, which was parked at the side of a road in an industrial area with its engine running and its lights on. The Commonwealth presented a circumstantial case against Little, and the jury were warranted in finding the following facts based on the Commonwealth's evidence.

Blanchette was Little's brother-in-law. He had married the defendant's sister Barbara in 1967, and in 1972 the relationship began to break down. Barbara Blanchette suspected her husband of "running around with other women," as she testified at trial. The couple quarreled frequently, and Barbara occasionally sought her brother's intervention in these quarrels.

The evidence warranted a finding that Blanchette and Little did not get along and that Little had threatened to kill Blanchette. Little had another sister, Linda, and the threat to Blanchette came in 1973 when Little had intervened in a personal dispute on Linda's behalf. One Earl Mayes testified that he had been keeping company with Linda Little in 1973, but that the two had parted company after a spat. Shortly thereafter, the defendant and another man confronted Mayes, took him to the Blanchette home, and beat him with a pistol. Mayes testified that Blanchette arrived home shortly after the beating and saw Mayes lying on the kitchen floor with his face bleeding. Thereon Little told Blanchette: "[S]ee what happened to this guy, the only difference between this is that you are going to be buried. . . . If you don't stop screwing around on my sister." The evidence tended to show

that this hostility continued up to the date of Blanchette's death. The defendant told police that he had argued with Blanchette several times on the evening that Blanchette was shot. These arguments related to Blanchette's extramarital activities.

Nine days before Blanchette's death, on June 2, 1975, Barbara Blanchette entered a local bar, accompanied by Linda Little, and found her husband seated with two women, whom she did not know, and another man. An argument ensued, and Barbara Blanchette thereafter consulted a lawyer. The evidence warranted an inference that she also went to Boston and discussed the incident with her brother, the defendant.

Little told police investigating the homicide that he came from Boston to New Bedford on the evening of June 11, 1975, with his mother at her request, to help straighten out Normand and Barbara's marital problems. He stated that he arrived at the Blanchette home about 9:30 P.M. and almost immediately got into an argument with Blanchette. Rather than argue at the house, in the presence of Little's mother and two sisters, the two went out to a bar and continued the argument there. Little told Blanchette to straighten out his marital problems. Blanchette became very angry and told Little — in language that need not be repeated here — that Little should mind his own business. He also told Little that he would not give him a ride home. As related at trial by the police witness, Blanchette told Little that if he wanted a ride home, he should call his mother.

According to Little's statement, Blanchette left the bar about 11:15 P.M. The two had driven to the bar in the pickup truck in which Blanchette's body was found about one hour later. The truck had been borrowed, and the owner testified that he spoke to Blanchette on the telephone at approximately 11:45 P.M. about difficulty that Blanchette was having starting the truck. The owner testified that it was necessary to push in the clutch to start the truck, but that he and Blanchette had conferred at

length about the truck that evening. Blanchette had driven the truck a number of times previously. Inferences were warranted, as argued to the jury by the prosecutor, that Blanchette, a professional bus driver, knew perfectly well how to start the truck, but that he feared for his safety, wanted a third person to be present, and called the truck's owner hoping to persuade him to come start the truck.

The Commonwealth's evidence allowed the jury to find that, after leaving the bar, Little rode in the pickup truck with Blanchette, who was driving; that sometime shortly before midnight Blanchette stopped the truck by the side of the road, a fairly short distance from the bar, in the spot where police later found his body; that Little shot Blanchette in the head twice while sitting in the passenger's seat; that Little then threw the gun in a drainage ditch; and that Little walked back to the bar, called his mother to come pick him up, and then drove back to Boston with her after stopping back at the Blanchette home briefly to speak with his sister.

Alibi witnesses testified that Little was back in the district of Boston known as the "Combat Zone" at 12:30 A.M., but the jury were warranted in finding that the defendant was still in New Bedford at least as late as midnight. A neighbor of the Blanchettes testified that at midnight she looked out her window and saw a car matching the description of Mrs. Little's parked outside the Blanchette home. Little told police that when he stopped on his way back to Boston, he stood outside the house and spoke to his sister through a window. The neighbor did not see anyone in the yard when she looked at midnight. The evidence thus permitted the jury to infer that, at midnight, Mrs. Little had not yet gone to pick up her son. Mrs. Little testified that it was she who drove most of the way back to Boston that night, and that the trip usually took her about seventy minutes.

A forensic pathologist testified that Blanchette had been shot twice in the right side of the head. Powder

burns and stippling around the wounds indicated, he said, that the killer had fired from very close range, probably not more than one foot away. An inference was warranted, as argued to the jury by the prosecutor, that the killer had to have been a passenger in the car, and therefore probably was known to the victim. Additionally, Blanchette had both credit cards and $107 in cash in his pockets when he died. Thus, the jury were warranted in concluding that robbery was not a motive.

In his statement to police, Little said that when he called his mother for a ride, he used the public telephone in a bar known as Smugglers' Den. Police asked him to describe the telephone, and Little described an ordinary public telephone. There was testimony that the telephone in Smugglers' Den was unique and memorable in that it was mounted in a dory standing on end against a wall. Police confronted Little with this fact, and Little had no further comment.

1. The first two assignments allege error regarding the prosecutor's opening statement. Counsel argues, first, that the conviction should be reversed because the prosecutor called Little's statement to the police an admission. Counsel next asserts that the prosecutor told the jury that the defendant would testify at trial. We note that no objection was made on these points during the opening or later, and no exception was taken. Although generally, "an assignment of error not based on an exception brings nothing to this court for review," *Commonwealth* v. *Myers*, 356 Mass. 343, 346 (1969), and cases cited, we address the defendant's arguments pursuant to our broad power of review in capital cases under G. L. c. 278, § 33E. Having examined the transcript in this case, we conclude that there was no error. Little's statement to police *was* an admission; there was no possibility that the jury might conclude from the prosecutor's remarks that Little had confessed to the crime. Moreover, the prosecutor did *not* say that the defendant would take the stand. The prosecutor said that a police officer would take the

stand and relate what Little had said at the station. The jury could not have been confused on this point. These two contentions of the defendant are utterly without merit.

2. Also without merit are assignments alleging that the judge erred in admitting prior inconsistent statements of two witnesses to impeach their credibility. The defendant argues that the witnesses were not given the opportunity to explain the inconsistencies. See G. L. c. 233, § 23. In this case there was no need for an explanation, however, since in each instance the witness denied having made the prior statement. Where the witness unequivocally denies making the inconsistent statement, it is obvious that no explanation is possible. *Commonwealth* v. *Ferrara,* 368 Mass. 182, 193 (1975).

3. Counsel next asserts that the judge erred in allowing testimony that, two years earlier, Little had pistol-whipped Mayes as a lesson to Blanchette. The record clearly shows that, after an extensive voir dire, the judge allowed this testimony because it tended to show the defendant's state of mind toward Blanchette, namely hostility, which could be found to have continued up to the time of Blanchette's death. There was no error. *Commonwealth* v. *Burke,* 339 Mass. 521, 534 (1959). *Commonwealth* v. *Bartolini,* 299 Mass. 503, 510-511 (1938). *Commonwealth* v. *Caruso,* 251 Mass. 362, 367 (1925). *Commonwealth* v. *Russ,* 232 Mass. 58, 72 (1919). *Commonwealth* v. *Holmes,* 157 Mass. 233 (1892).

4. The defendant argues that the judge erred in denying a motion for directed verdict. There was no error. There was sufficient evidence from which the jury could infer beyond a reasonable doubt that the defendant, was with Blanchette at the time of the murder, that he had a motive to kill him, and that he did so. Accepting the evidence in the light most favorable to the defendant, *Commonwealth* v. *Earltop,* 372 Mass. 199, 200 (1977), it is clear that the jury were warranted in returning a verdict of guilty.

5. The defendant makes several assignments relating to the judge's charge. Counsel argues that the judge erred in instructing the jury relative to determining the credibility of witnesses and relative to the alibi defense, the Commonwealth's burden of proof, and evidence of consciousness of guilt. Having read the charge, we conclude that the defendant's assignments border on the trivial. Each focuses on a word or a sentence taken out of context, and the argument as to each is that the judge conveyed an erroneous impression to the jury. "We are concerned only with the impression left with the jury by the charge as a whole . . . ." *Commonwealth* v. *Hicks*, 375 Mass. 274, 280 (1978). See also *Commonwealth* v. *Ramey*, 368 Mass. 109, 114 (1975); *Commonwealth* v. *Benders*, 361 Mass. 704, 707 (1972). We are satisfied that the judge instructed the jury clearly and correctly.

(a) *Credibility of witnesses.* Much of the testimony at trial came from members of the defendant's family, and the defendant now argues that the judge unfairly stressed bias as a factor to be considered in assessing witness credibility. The defendant also argues that the judge failed to mention other factors that might affect witness credibility. A complete reading of the charge shows that the judge was well aware of the problems surrounding the testimony of the defendant's family and took every precaution necessary in order not to prejudice the jury against their testimony.

(b) *Alibi.* The defendant claims that the charge with respect to alibi left the jury confused as to which side bore the burden of proof. A reading of the charge shows this argument to be completely without merit. The defendant concedes that the judge gave the charge approved by this court in *Commonwealth* v. *McLeod*, 367 Mass. 500, 502 n.1 (1975).

(c) *Burden of proof.* The defendant maintains that the charge understated the Commonwealth's burden of proof. There was no error. After describing what was and was not proof beyond a reasonable doubt, the judge concluded

this section of the charge by instructing as follows: "If . . . the state of the evidence in your mind is that the evidence is equally consistent with guilt as it is with innocence . . . then obviously the Commonwealth has not discharged its burden of proving the defendant's guilt beyond a reasonable doubt; and if your mind is of that kind, then the defendant must be acquitted. That's where the scales are even." The defendant's argument is that the quoted portion detracted from what preceded it and confused the standard of proof. There is no merit to the argument.

(d) *Consciousness of guilt.* The judge instructed that the jury could consider the defendant's admission at the police station, if voluntarily made, to be evidence of the defendant's consciousness of guilt. The judge correctly stated the law. See *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 50 (1975); *Commonwealth* v. *Barber,* 261 Mass. 281, 288 (1927); *Commonwealth* v. *Trefethen,* 157 Mass. 180, 199 (1892).

6. The defendant claims that he did not receive the effective assistance of counsel. Acting on a motion for a new trial, the judge heard testimony regarding the performance of trial counsel as measured by standards outlined in *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).[1] The judge made detailed findings of fact and denied the motion. Having examined the transcript of the hearing on the motion for a new trial, we hold that the denial of a new trial lay within the judge's sound discretion. *Commonwealth* v. *Devereaux,* 257 Mass. 391, 394 (1926). Moreover, we hold that there was no deprivation

---

[1] In that case we said: "[W]hat is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer—and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 96 (1974).

of the defendant's constitutional right to effective assistance of counsel.

A year after the trial, the defendant's trial counsel testified in support of the motion for a new trial. (The defendant had changed lawyers in the meantime.) Trial counsel testified that his personal problems at the time had interfered with his handling of the case. He also said that he had been taking medication at the time which affected his clear thinking. In his brief, the defendant recites a litany of evidentiary objections counsel might have made at trial, witnesses he might have called, and alternative courses of action of which the defense might have availed itself. In each instance, the claimed fault related either to trial tactics or the alternative choices that ordinarily face any trial lawyer. An examination of the record shows that the performance of counsel was not of such poor quality as to entitle the defendant to a new trial. In evaluating the defendant's claim, we use an objective standard and look to the record for substantiation of the defendant's allegations. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 111 (1977). Although we give consideration to counsel's subjective and belated evaluation of his own performance, his opinions are of course not conclusive in light of all other factors in the record.

Looking to the facts of this case, it is clear that counsel's behavior did not fall measurably below what might be expected from an ordinary, fallible lawyer. Counsel appears to have been adequately prepared. He exercised his peremptory challenges to jurors. He moved for a mistrial and change of venue when the case received local publicity after the jury had been empanelled. He actively participated in a view. He made timely objections during trial, took exceptions to adverse rulings, and participated forcefully in bench conferences. He adequately—if not brilliantly—cross-examined government witnesses, and he called witnesses on behalf of his client. Defense counsel participated in the voir dire of government witness Mayes and argued competently against the admission of

his testimony. He presented and argued motions for directed verdict, new trial, and stay of sentence pending appeal. He filed a timely appeal. The judge below found that, prior to the trial and throughout the course of the trial, defense counsel talked with the defendant and members of his family. In short, this is not a case where "counsel's representation was so ineffective that the defendant was granted no trial in any real sense." *Commonwealth* v. *Dunker,* 363 Mass. 792, 797 (1973).

We find no merit in the defense argument based on counsel's decision not to present all available alibi witnesses. Counsel could sensibly conclude that putting them all on the stand would do more harm than good. The same is true of counsel's recommendation that the defendant not testify. Little had a criminal record which surely would have been introduced to impeach his credibility. As for the medication, there is no objective indication that it impeded counsel's effectiveness at all.

7. We have examined the entire record in accordance with our duties under G. L. c. 278, § 33E, and we observe nothing which in justice indicates that we should modify the result reached by the jury.

*Judgment affirmed.*