Albert G. **LITTLE**, Petitioner,

v.

Paul B. **MURPHY**, Respondent.

No. Civ.A. 95–CV–10889RGS.

United States District Court,
D. Massachusetts.

Aug. 13, 1999.

---

Charles K. Stephenson, South Hadley, MA, for Petitioner.

William J. Duensing, Asst. Atty. Gen., Criminal Bureau, Boston, MA, for Respondent.

### ORDER

STEARNS, District Judge.

On July 7, 1999, Magistrate Judge Karol issued a Report and Recommendation regarding the respondent's motion to dismiss the remaining claims of petitioner's writ of habeas corpus. On August 4, 1999, and again on August 5, 1999, petition filed an objection to the Magistrate Judge's determination that (1) the trial court's jury instructions were not constitutionally defective and (2) petitioner was not denied effective assistance of counsel. The court adopts the Recommendation. The respondent's motion to dismiss is *ALLOWED*. The petition is *DISMISSED*.

SO ORDERED.

### SECOND REPORT AND RECOMMENDATION CONCERNING RESPONDENT'S MOTION TO DISMISS THE PETITION FOR WRIT OF HABEAS CORPUS (DOCKET NO. 16)

KAROL, United States Magistrate Judge.

On April 15, 1995, Petitioner, Albert Little ("Petitioner"), filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (West Supp.1999). In that application, Petitioner originally asserted four grounds for habeas relief. Two separate orders of this court disposed of Petitioner's claims of actual innocence, unconstitutional jury instructions concerning malice, and prosecutorial misconduct. *Little v. Murphy*, 95cv10889–RGS (D.Mass. Sep. 6, 1996) (dismissing claim of prosecutorial misconduct for failure to exhaust state remedies), Docket No. 21; *id.* (D.Mass. Aug. 6, 1998) (adopting my May 21, 1998 recommendation of dismissal as to Petitioner's claims of actual innocence and an allegedly faulty malice instruction), Docket No. 45. Following the second of these orders, I directed Respondent, Paul Murphy ("Respondent"), to file with the court the complete trial transcript as well as memoranda addressing the merits of Petitioner's remaining claims. *Scheduling Order,* Docket No. 39.

This Report and Recommendation addresses Petitioner's two remaining grounds for seeking relief: (1) that the trial judge gave unconstitutional jury instructions concerning alibi and the burden of proof; and (2) that Petitioner was denied the effective assistance of counsel. For reasons set forth below, I recommend that Respondent's motion to dismiss be **ALLOWED** as to all of Petitioner's remaining claims and that the petition be **DISMISSED**.

### 1. Standard of Review

■ Petitioner filed his initial habeas application on April 15, 1995, more than one year prior to the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1) ("AEDPA"). Pre–AEDPA law thus governs his petition. *Lindh v. Murphy*, 521 U.S. 320, 336–37, 117 S.Ct.

2059, 138 L.Ed.2d 481 (1997).[1] Petitioner is "therefore entitled to plenary review of his claim that the state court abridged his constitutional rights." *Martin v. Bissonette*, 118 F.3d 871, 874 (1st Cir.1997); *see Scarpa v. DuBois*, 38 F.3d 1, 9 (1st Cir. 1994) (pre-AEDPA case explaining that federal courts traditionally afford *de novo* review in respect to habeas petitions brought by state prisoners); *Restrepo v. Dipaolo*, 1 F.Supp.2d 103, 105 (D.Mass. 1998) (contrasting the standards of review before and after AEDPA).

## II. Discussion [2]

Two of Petitioner's original four grounds for seeking the great writ remain before this court. First, he alleges that the trial judge's instructions on alibi and reasonable doubt relieved the Commonwealth of its burden of proving his guilt beyond a reasonable doubt in violation of his Fourteenth Amendment right to due process. *Petition*, ¶ 12B. Second, he claims that his trial counsel's performance denied him his Sixth and Fourteenth Amendment rights to the effective assistance of counsel. *Id.* at ¶ 12C. I will address each of these claims in turn.

### A. Alibi Instruction

Judge Dwyer gave the following instruction concerning Petitioner's alibi:

> There is testimony in this case and there has been argument by counsel that the defendant could not have committed this crime because he was at a time and place other than the boulevard

where the killing took place. This is what is known as a defense of alibi, which while it may have a bad connotation in the understanding of a layman, is a valid and legitimate defense to any crime. So it is up to you to determine and evaluate the evidence that has been introduced tending to establish this alibi. This amounts to a contention that the defendant was not present at the time nor the place where he is alleged to have committed the offense charged.

> If, after consideration of all the evidence in this case, you have a reasonable doubt as to whether the defendant was present at the time and place the alleged offense was committed, then you must, of course, acquit him. When there is an assertion of this defense, it becomes incumbent upon the trial judge to instruct the jury that they will always bear in mind that the law never imposes upon a defendant in a criminal case the burden of proving his innocence.

> And that principle also applies to a case such as we have where there was evidence offered regarding an alibi. The burden never shifts to the defendant to prove that alibi. The burden always remains with the Commonwealth.

> So how do you handle that situation? You evaluate the Commonwealth's evidence, and you review all of the evidence of the defendant that he was at another place at the time alleged. And when you have reviewed both the Commonwealth's side and when you have reviewed the defendant's alibi, then the

---

**1.** Judge Stearns originally dismissed Petitioner's application without prejudice for failure to exhaust state remedies. *See Order of Judgment*, Docket No. 22. On reconsideration, however, he allowed Petitioner to amend his application so as to delete his unexhausted claim, thus preserving his pre-AEDPA filing date. *See* Docket No. 23. I therefore need not reach the interesting question of whether a pre-AEDPA petition dismissed without prejudice becomes a "post-AEDPA petition" when refiled after the Act's effective date. *See, e.g., Mancuso v. Herbert*, 166 F.3d 97, 101 (2d Cir.1999) ("We conclude that the AEDPA ap-

plies to a habeas petition filed after the AEDPA's effective date regardless of when the petitioner filed his or her initial habeas petition and regardless of the grounds for dismissal of such earlier petition.").

**2.** This Report and Recommendation presumes familiarity with the facts alleged at Petitioner's trial. For a more comprehensive review of the evidence, see *Commonwealth v. Little*, 376 Mass. 233, 379 N.E.2d 1105, 1106–07 (1978). References to the trial transcript appear throughout as "Tr. Vol."

question you put to yourselves: which is truthful, which is reliable, which is the most accurate, which am I going to accept. Having in mind all the time that the obligation is upon the Commonwealth to prove that the defendant was at the place and at the time that the killing allegedly took place.

Tr. Vol. VIII at 913–14

■ When a habeas petitioner challenges the constitutionality of any jury instruction, the proper inquiry is whether there is a reasonable likelihood that the jury applied that instruction in an unconstitutional manner. *Estelle v. McGuire,* 502 U.S. 62, 72 & n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Gilday v. Callahan,* 59 F.3d 257, 260 (1st Cir.1995). Moreover, the challenged portion of the jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

Petitioner acknowledges that much of Judge Dwyer's alibi charge mirrors the instruction that the SJC first endorsed in *Commonwealth v. McLeod,* 367 Mass. 500, 326 N.E.2d 905, 906 n. 1 (1975). The SJC has continually reaffirmed that instruction, most recently in 1997. *Commonwealth v. Richardson,* 425 Mass. 765, 682 N.E.2d 1354, 1357 (1997).³ Nevertheless, Petitioner takes issue with some of the trial judge's surplusage—language not part of the original *McLeod* instruction. Judge Dwyer's use of the phrase "defense of alibi," for example, is one that *McLeod* specifically frowns upon. Pet.Mem. at 81; *McLeod,* 326 N.E.2d at 906. Further, Petitioner complains that the judge shifted the burden of proof to him by directing the jury to "evaluate the Commonwealth's evidence, . . . review all of the evidence of the defendant that he was at another place at the time alleged" and decide "which is truthful, which is reliable, which is the

most accurate, which I am going to accept." Pet.Mem. at 81; Tr. Vol. VIII at 914.

■ Citing *Francis v. Franklin,* 471 U.S. 307, 322, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), Petitioner argues that this final section of the instruction is "diametrically" opposed to the *McLeod* language that properly allocates the burden of proof. Pet.Mem. at 81. In *Francis,* the Supreme Court held that "language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to resolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." 471 U.S. at 322, 105 S.Ct. 1965.

■ Even assuming that the trial judge's emphasis on truth, reliability and accuracy is constitutionally infirm, clarifying language *immediately* followed: "Having in mind all the time that the obligation is upon the Commonwealth to prove that the defendant was at the place and at the time that the killing allegedly took place." Tr. Vol. VIII at 914. Petitioner's charge is thus unlike the one in *Francis,* where nothing made certain "that one of these contradictory statements carrie[d] more insight than another." 471 U.S. at 322. Where the trial judge stated on three separate occasions that the Commonwealth retained the burden of disproving the alibi, there is no reasonable likelihood that a juror applied the instruction to allow conviction on less than proof beyond a reasonable doubt. *See Gilday,* 59 F.3d at 260–61. The SJC was undoubtedly correct to deem this issue to be "completely without merit" on direct review. *See Little,* 379 N.E.2d at 1109. Accordingly, I recommend that Petitioner's claim of unconstitutional jury instructions regarding his alibi be dismissed.

---

**3.** The *McLeod* instruction is derived from its federal cousin. DEVITT & BLACKMAR, FEDERAL JURY PRACTICE AND INSTRUCTIONS, § 11.31 (1970).

## B. Reasonable Doubt Instruction

Petitioner also challenges Judge Dwyer's instructions on reasonable doubt, which were as follows:

It is not enough for the Commonwealth to prove its case by the weight of the evidence, by the preponderance of the evidence, by the balance of the evidence. That's not enough. The Commonwealth is obliged to prove its case beyond a reasonable doubt.

Now, what do we mean by proof beyond a reasonable doubt? Let me attempt to tell you what proof beyond a reasonable doubt does not mean, and in that way hopefully [ ] clear your mind as to what proof beyond a reasonable doubt does mean. Proof beyond a reasonable doubt does not mean proof beyond all doubt. There is no matter in the course of human affairs that is capable of absolute certitude. So that proof beyond a reasonable doubt does not mean proof beyond all doubt. It does not mean proof beyond the possibility of innocence. It does not mean proof beyond a fanciful or capricious or whimsical or arbitrary doubt that you conjure up in your mind. And it certainly does not mean a doubt that may exist in the mind of a juror who is looking for a doubt in order to acquit the defendant or an excuse to acquit the defendant. That's not a reasonable doubt at all.

Now, I have told you what a reasonable doubt is not. Now, what is it on the positive side? On the positive side, a reasonable doubt does mean a doubt that remains in the mind of a reasonable juror who is seeking the truth. I am back to that key word again: seeking the truth. That is the question that you want to put to yourself and to your conscience. Am I seeking the truth? It is the paramount question.

A fact is proved beyond a reasonable doubt when it is proved to a moral certainty, when it is proved to that degree of certainty that satisfies your conscience and your judgment as reasonable people and leaves in your mind a well settled conviction of guilt. That's what we do mean by reasonable doubt.

So merely to tie up this aspect of the Commonwealth's obligation to prove guilt beyond a reasonable doubt, let me summarize it in this way. When you have gone to your deliberating room, when you have evaluated all of the evidence, when you have selected what evidence is reliable and what accurate and truthful, and when you have applied the principles of law that the judge is going to give you, when you have done all that, if there remains in your mind any reasonable doubt as to the guilt of this defendant, the defendant must have the benefit of that doubt and the defendant must be acquitted and found not guilty.

On the other hand, if after having gone to your deliberating room and you have performed this total evaluation of the evidence that I have referred to and the application of the legal principles which I will give to you, if then you are satisfied beyond a reasonable doubt of the defendant's guilt as I have defined it to you, it is your obligation, your obligation and duty, to return a verdict of guilty.

In between the two extremes which I have just described for you, let me come to a third. If after you have performed that function in your deliberating room of evaluating all of the evidence, selecting the credible and reliable evidence, applying the law that the judge is going to give you, if after having done all of that, the state of the evidence in your mind is that evidence is equally consistent with guilt as it is with innocence—equally consistent with guilt as it is with innocence—then obviously the Commonwealth has not discharged its burden of proving the defendant's guilt beyond a reasonable doubt; and if your mind is of that kind, then the defendant must be acquitted. That's where the scales are even.

Tr. Vol. VIII at 903–906

Petitioner claims that two aspects of this instruction, when taken together, derogat-

ed the Commonwealth's burden of proof. First, he argues that the use of a "scale" analogy improperly introduced the civil "preponderance of the evidence" standard into the jury's understanding of the burden of proof. Second, he claims that Judge Dwyer repeatedly and impermissibly emphasized the juror's roles in "determin[ing] where the truth lies," thereby shifting the jury's role to that of arbiters in a credibility contest rather than a body that assesses whether the Commonwealth has met its burden of proof. Pet.Mem. at 82–83.

■■■■ The First Circuit has stated that "while criminal defendants often challenge instructions on reasonable doubt, 'our experience has been that even imperfect formulations usually meet constitutional requirements when viewed in the context of the entire charge.'" *Watkins v. Ponte*, 987 F.2d 27, 32 (1st Cir.1993) (citing *Lanigan v. Maloney*, 853 F.2d 40, 45 (1st Cir. 1988)). A court must "tolerate a reasonable range of expression, some or even much of which may not suit [its] fancy," unless it chooses to impose pattern jury instructions. *Id.*; *Bumpus v. Gunter*, 635 F.2d 907, 910 (1st Cir.1980). In this case, Judge Dwyer's instructions may have been "less than perfect," and perhaps "confusing in parts," but they did not "rise to the level of constitutional infirmity." *See Watkins*, 987 F.2d at 32.

In *Lanigan*, the First Circuit criticized an instruction suggesting "that the jury's task is to figure out which side is 'right' rather than to determine whether the government proved guilt beyond a reasonable doubt." 853 F.2d at 47–48. The court reasoned that such an instruction would "increase the jury's tendency to undervalue the reasonable doubt standard." *Id.* In *Lanigan*, however, the point of departure for reversal of the petitioner's conviction was a definition equating reasonable doubt with "a degree of moral certainty," an instruction that already understated the burden of proof. The emphasis on truth-seeking in that case only served to in-

crease the risk that a jury could convict on "a degree of moral certainty"—an impermissibly lax standard.

Here, Judge Dwyer defined reasonable doubt, affirmatively and negatively, in several ways that both the First Circuit and Massachusetts courts have approved: "not ... proof beyond all doubt," "not proof beyond the possibility of innocence," "doubt that remains in the mind of a reasonable juror who is seeking the truth," and proof that "leaves in your mind a well settled conviction of guilt." Tr. Vol. VIII at 903–906. By establishing a constitutionally acceptable departure point for the jury, these definitions of reasonable doubt reduced the risk that an emphasis on the truth-seeking function allowed conviction on a lesser standard of proof.

The result is the same where Petitioner's charge includes a reference to "scales." In *Lanigan*, a lengthy and confusing discussion of the civil standard of proof heightened the already substantial risk created by the "a degree of moral certainty" instruction. Here, Judge Dwyer's instruction to acquit "where the scales are even" did not approach *Lanigan*'s convoluted discussion of the civil standard. *See, e.g.*, 853 F.2d at 46. Moreover, the appropriate definitions of reasonable doubt elsewhere in the charge lessened any prejudicial impact the scales analogy may have had.

Thus, taken together, the challenged aspects of the instructions "did not so infect the entire charge and trial as to cause the jury to evaluate Petitioner's guilt or innocence under a standard less than beyond a reasonable doubt.'" *See Lanigan*, 853 F.2d at 48 n. 7 (quoting *Bumpus*, 635 F.2d at 909, for standard required to reverse state conviction on reasonable doubt instructions). Accordingly, any infirmity of the jury instructions with respect to reasonable doubt does not warrant the issuance of the writ, and this ground should also be dismissed.

## C. Ineffective Assistance of Counsel

Petitioner's final argument is that he was denied the effective assistance of counsel. The governing rule regarding ineffective assistance is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There, the Supreme Court held that in order to substantiate a claim of ineffective assistance, a petitioner must show not only that trial counsel made serious errors, but that those errors so prejudiced the defense that there is a reasonable probability that, but for the deficiencies, the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 687, 694, 104 S.Ct. 2052; *United States v. Ademaj,* 170 F.3d 58, 64 (1st Cir.1999); *Scarpa,* 38 F.3d at 8; *Stevens v. Maloney,* 32 F.Supp.2d 478, 480 (D.Mass.1998) (Neiman, M.J.).

As the First Circuit has observed, evaluation under the first prong of the *Strickland* standard "demands a fairly tolerant approach; after all, the Constitution pledges to an accused an effective defense, not necessarily a perfect defense or a successful defense." *Scarpa,* 38 F.3d at 8. Moreover, since lawyers necessarily differ over trial tactics in a particular case, *Strickland* itself demands that a reviewing court "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; . . . ." 466 U.S. at 689, 104 S.Ct. 2052.

Petitioner and Respondent agree that *Strickland* governs Petitioner's claim but part company in their assessment of counsel's performance. Where Petitioner sees a virtually uninterrupted stream of egregious and prejudicial errors, Respondent sees "trial tactics" and "strategic decisions" presumed under *Strickland* to fall within the wide range of reasonable professional assistance.

I have reviewed the complete transcript of Petitioner's trial. I have also examined Petitioner's several collateral motions for relief due to ineffective assistance; the transcripts of hearings on those motions; and the Massachusetts courts' denial of those claims in each instance. After doing so, I share the views of each of the several learned judges that has considered this question before me: the performance of Petitioner's trial counsel was not stellar, but it was certainly adequate, and therefore did not fall below the minimum standard that the Constitution guarantees. *See Scarpa,* 38 F.3d at 8; *United States v. Natanel,* 938 F.2d 302, 309–310 (Petitioner is entitled to "reasonably effective assistance under the circumstances."); *Stevens,* 32 F.Supp.2d at 481 (same). Moreover, even if I were to find that counsel's performance was constitutionally infirm, there is no reasonable probability that the outcome of Petitioner's trial would have been any different had counsel's performance conformed to minimally adequate constitutional standards. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Petitioner provides a laundry list of trial error: 1) unnecessary cross-examinations of unimportant witnesses; 2) ineffective cross-examinations of crucial witnesses or ineffective examination of Petitioner's own witnesses; 3) failure to call witnesses that could have substantiated Petitioner's alibi or assigned motive and opportunity to kill the victim to someone other than Petitioner; 4) agreement to prejudicial stipulations; and 5) numerous meaningless objections on the one hand and numerous failures to object on the other. Pet.Mem. at 63–77. Petitioner attributes much of this performance to the "severe emotional stress affecting [counsel] at the time, as he faced indictment for his own alleged criminal misconduct." Pet.Mem. at 74.

Respondent takes issue with several of these points in his memorandum, but mostly relies on the presumption under *Strickland* that counsel's performance was within the wide range of reasonable professional assistance. *See* Resp.Mem., Docket No. 34, at 14 ("Obviously, counsel will not ask, and will not be performing below the constitutional norm if he does

not ask, every textbook question of every witness."); *id.* at 15 ("In the end, the errors petitioner alleges are minor, and counsel's actions are subject to reasonable interpretation as tactical and strategic choices. . . ."). Moreover, Respondent echoes the SJC's conclusions as to what counsel *did* do, rather than what he failed to do. *Id.* at 15 ("He exercised peremptory challenges, moved for mistrial and for change of venue due to publicity after jury impanelment, participated actively in a view, made timely objections and took exceptions to adverse rulings. He participated in bench conferences, 'adequately—if not brilliantly—cross-examined government witnesses . . . ,' called defense witnesses, participated in voir dire, argued legal issues, presented and argued motions for directed verdict, new trial, and stay of sentence. He filed timely notice of appeal. He talked with the petitioner and his family.") (quoting *Little*, 379 N.E.2d at 1110).

I turn now to the errors that Petitioner claims made his counsel's performance constitutionally and prejudicially infirm.

### 1. *Unnecessary Cross–Examinations*

 Petitioner argues that several of counsel's cross-examinations unnecessarily implied, where Petitioner's defense was alibi, that he needed to distance himself from the alleged murder weapon. Examples of these "unnecessary" cross-examinations include: counsel's attempt to get the medical examiner to concede that two different weapons could have fired the two fatal shots (Tr.Vol. III at 83–84) and his attempt to cast doubt on the chain of custody of the weapon and ammunition (*id.* at 123–24; 171–81). Although there is a risk that the jury might infer that Petitioner was trying to "distance himself" from the murder weapon, another permissible inference is that there *was* a different weapon, or a second weapon, involved in the shooting. Competent counsel often pursue lines of inquiry that do not, for one reason or another, bear evidentiary fruit. Such an effort in and of itself does not fall

outside the wide range of reasonable professional assistance. Counsel's cross-examinations of a responding officer as to how he arrived at the murder scene (Tr. Vol. IV at 126–127) or of the child who found the alleged murder weapon (*id.* at 171–81) were similarly unlikely to accomplish anything, but they were neither substandard nor prejudicial.

 Counsel also attempted to cross-examine the Commonwealth's ballistics expert (and called his own ballistics expert) to suggest the possibility of a second weapon. Tr.Vol. V at 465–71; Tr.Vol. VII at 715–716. Petitioner argues again that this was error where the Commonwealth introduced evidence that Petitioner had been seen with a handgun different from the alleged murder weapon several years earlier. Pet.Mem. at 64. Petitioner's argument lacks merit. Under counsel's so-called "second weapon" theory, the second weapon was a '357 Magnum. Tr.Vol. V at 465. The "second weapon" that Earl Mayes testified to Petitioner striking him with was a '38 long-barreled revolver. Where the prosecution did not attempt to show that the '38 that Mayes described was a murder weapon, it is almost inconceivable that the jury concluded that Petitioner was the killer, but that he had killed with a different weapon than the one found near the scene that was consistent with the bullets recovered at the scene.

### 2. *Ineffective Examinations and Cross–Examinations*

Petitioner next argues that counsel weakened his alibi defense by failing to cross-examine adequately several prosecution witness.

 *David Weeks.* Petitioner challenges counsel's cross of Weeks, the security guard who first observed the truck that turned out to contain the victim's body. Tr.Vol. IV at 143–161. Weeks testified on direct that he first saw the truck between 11:45 P.M. and 12:00 A.M. on the night in question. On cross, counsel asked

Weeks if it was possible that he had seen the truck at 11:30. Weeks replied that he did not think so. Petitioner faults counsel for not pressing the guard for a concession that he first saw the truck closer to 11:30 than he had previously testified, presumably because a discovery time closer to 11:30 was more consistent with Petitioner's alibi. Where the witness had already denied seeing the truck at 11:30 and testified that it could have been as early as 11:45, it was clearly a matter of trial tactics not to belabor the point, and counsel was not clearly wrong to refrain from doing so.

■ *John Green.* Green, the doorman at the Smuggler's Den, gave damaging testimony on direct that the victim had come to and left the bar alone and at times consistent with the Commonwealth's theory of the case.[4] Petitioner argues here that counsel should have pressed the doorman as to duties that might have kept him from seeing the victim enter with Petitioner. Instead, counsel focused on Green's inability to identify the victim's body later that evening. Here again, counsel made reasonable tactical decisions. First, Green had already left open that it was possible that Petitioner entered the bar when Green was not on duty at the door (Tr.Vol. IV at 211). Second, it was reasonable to pursue a line of inquiry suggesting that if Green could not identify the victim at midnight, he may have been mistaken in saying that he saw the victim arrive by himself at the bar at a certain hour.

■ *Michelle Garnett.* Garnett, an acquaintance of the victim's, testified that the victim was at the hospital during the same period that Green had testified to his being at the bar. Petitioner faults counsel for failing to press this inconsistency. I do not see ineffective assistance here. The conflict was there; failing to press it further was certainly not prejudicial. To the extent that Petitioner claims that counsel's cross opened the door (*id.* at 229) to redirect of Garnett showing that a fight broke

out between the victim and his wife and sister-in-law when the victim was seen at a bar with another woman, the evidence was not prejudicial where Judge Dwyer excluded almost all of the evidence of the fight, other than to allow Garnett to state that the victim's wife and sister-in-law were present at the bar. *See id.* at 231–32.

■ *Richard Reed.* Reed was the owner of the truck in which the victim died. *Id.* at 242–250. Petitioner faults counsel for failing to capitalize on Reed's clearly mistaken testimony that he had received a call from the victim at 10:45 P.M., a time consistent with Petitioner's alibi. It is clear, however, from the rest of Reed's testimony that the call came at 11:40 or 11:45 where Reed remembers having arrived home, watched the 11:00 news and received the victim's call. *See id.* at 242. Counsel tried once to get Reed to confirm the 10:45 statement, and when Reed failed to do so, counsel presumably elected not to take on Reed again on this issue. There was no point in pressing further once Reed had made his answer consistent with the rest of his testimony. These tactical decisions were not error.

■ *Isabel Almeida.* Almeida, a neighbor of Petitioner's family, gave prior inconsistent statements to the police about the make (Ford or Chevrolet) of a green car that she saw in the Petitioner's family's driveway at a time inconsistent with Petitioner's alibi. Petitioner faults counsel for not expressly bringing out this inconsistency. Where Almeida had already testified that she was not knowledgeable as to the make and model of cars (Tr.Vol. VI at 644–650, 652–55), and that she had not identified the car as a Ford (Petitioner's mother's model), counsel could reasonably conclude that that was as much as he might hope to get from Almeida. It was not constitutional error to fail to press Almeida to confirm that she had told the police of a green Chevrolet.

---

**4.** Petitioner and his family members made statements that Petitioner had gone to the Smuggler's Den with the victim much later in the evening.

■ *Wesley Baroa.* Baroa, a defense witness and the bartender at the Smuggler's Den, testified on direct that he saw the victim in the bar between 9:30 and 10:00 P.M. Baroa earlier gave the police a statement more consistent with Petitioner's alibi, stating that he had seen the victim in the bar with an individual possibly matching Petitioner's description between 10:30 or 11:00 P.M. Even if, as Petitioner claims, counsel did not press this inconsistency fully, the discrepancy did come out. Moreover, the prosecution deftly covered any gaps that counsel might have created when Baroa explained on cross that he did not have a watch, that the bar was crowded that evening and that he had not been keeping track of time. Tr.Vol. VII at 742–745. There was no incompetence here, and certainly no prejudice, even if counsel failed to interview the bartender in advance.

■ *Patrick Little.* Petitioner's final claim of incompetence with respect to counsel's examinations relates to that of Petitioner's brother, Patrick Little ("Patrick"). Petitioner claims that counsel's questioning of Patrick concerning an alleged pistol-whipping served to confirm, rather than cast doubt upon the fact that such a beating had taken place. Counsel appropriately asked Little whether he was present at an alleged pistol whipping, to which Little replied that he had not been. Patrick's detailed response to Counsel's next question, "Where were you [that evening]," may have been too much for the jury to believe,. and the prosecutor later capitalized on Patrick's selective memory (Tr.Vol. VII at 735), but it is impossible to say that this prejudiced Petitioner so much as to make the trial unreliable.[5]

### 3. *Failure to Call Witnesses to Attribute Motive and Opportunity*

■ Petitioner next faults counsel for failing to introduce evidence, despite being made aware of its existence by members of Petitioner's family, that Earl Mayes had motive and opportunity to kill the victim. Petitioner points to evidence that Mayes, more than one year prior to the murder, had threatened the victim when he demanded that Mayes pay him money owed as a result of a business deal gone bad. Pet.Br. at 72–73. The problem here is that counsel could reasonably conclude that this evidence was so remote from the murder as to have little probative value. Nor was there any credible basis to suggest that Mayes and the victim were even together on the night of the murder.[6] The fact that, a year earlier, Mayes had told the victim not to bother him anymore about the money is hardly proof that Mayes killed the victim.

### 4. *Prejudicial Stipulation*

■ Petitioner next faults counsel for stipulating to damaging and otherwise in-

---

5. Although it is unclear from his papers, Petitioner may also be challenging counsel's failure to object to the Commonwealth's question on cross, "But then you told us that on the night that this beating occurred that you were in Malden at your sister's home, is that correct." Patrick answered affirmatively, even though the Commonwealth did not qualify its question by suggesting that the beating was only "alleged." If Petitioner is making it, this challenge is without merit. It is clear from the Commonwealth's earlier and later questions that all parties were referring to an "alleged" beating. Counsel was not constitutionally infirm for failing to object here, and Petitioner certainly was not prejudiced by that aspect of the questioning. As suggested above, the problem with Patrick Little's testimony was its credibility, not that counsel elicited information contrary to Petitioner's de-

fense. *Cf. United States v. DeCoster,* 487 F.2d 1197, 1201 (D.C.Cir.1973) ("[The resulting] *contradiction* confused the defense case and stripped it of its credibility.") (emphasis supplied).

6. Although Petitioner claims that he and his relatives were willing to testify to these facts, counsel could reasonably conclude that their testimony was subject to impeachment. Moreover, absent any evidence that Mayes had an *opportunity* to kill the victim, Judge Dwyer was skeptical that evidence of Mayes' motive would have been admissible if offered. *Hearing on Defendant's Motion for a New Trial,* attached as Ex. A to Motion 2 to *Motions for a New Trial Filed in State Court,* Docket No. 19, at 29–31; *see also id.* at 72.

admissible testimony by an attorney, Frederick McLaughlin, Jr. The parties stipulated that McLaughlin, if called as a witness, would have testified that Earl Mayes told him in 1975 that Petitioner had pistol-whipped Mayes and threatened the victim in 1974, not, as Mayes testified on direct, in 1973. Although it is unclear from the transcript whether the Commonwealth or the Petitioner was the proponent of this stipulation, the evidence clearly cut both ways. On the one hand, Mayes' confusion on the year of the alleged beating tended to impeach his credibility as to whether the event happened at all; such a prior inconsistent statement would be, contrary to Petitioner's claim, admissible in evidence and favorable to Petitioner. On the other hand, Mayes' statement tended to confirm, favorably to the prosecution, that the beating occurred on some date, and would likely have been admissible as a prior consistent statement refuting Petitioner's attempt to cast doubt on Mayes' credibility. *See* Tr. 618–620; *Commonwealth v. Saarela*, 376 Mass. 720, 383 N.E.2d 501, 503 (1978) (discussing prior consistent statements exception to hearsay rule). Given the dual potential of Mayes' statement, I am not prepared to say that counsel's tactical decision was outside the reasonable range of professional assistance.

### 5. *Meaningless Objections and Failures to Object*

■ As further evidence of constitutional infirmity, Petitioner cites 18 instances where counsel made "seemingly meaningless objections." Pet.Mem. at 74. I reject these as bases for a finding of constitutionally ineffective assistance, at a minimum because Petitioner has failed to develop any argument as to these instances and because Petitioner made no attempt to show prejudice from any of these objections.

As to Petitioner's argument that counsel failed to make several objections that he should have made:

■ The first group of omitted objections could have come during the Commonwealth's opening statement. The prosecutor did state incorrectly that Petitioner would "testify," Tr.Vol. III at 61, and characterized Petitioner's statement as an "admission," *id.* at 61–62, but it also seemed clear from context that Petitioner's statements were coming in by way of police testimony regarding admissions Petitioner had made to them when he was questioned. Whether or not to object during an opponent's opening is a sensitive tactical issue, so although it can be argued that an objection could have and perhaps should have been made, counsel's failure to object is not evidence of constitutionally deficient performance.

■ As to counsel's alleged failure to object to the prosecutor's attempt to elicit "inflammatory hearsay" from the victim's first wife as to what Petitioner's sister said the day after the shooting, counsel did object. That the trial court overruled his objection does not make his assistance infirm.

Finally, the fact that the trial judge had to intercede where counsel failed to make objections is of no help to Petitioner. That the trial judge interceded and asked the proper questions when he did intercede eliminates any prejudice arising from counsel's having failed to ask them.

### 6. *Counsel's Health Issues and Fear of Indictment*

■ To the extent Petitioner claims that counsel was deficient due to his fear of a pending indictment or due to health problems, these arguments are outside the scope of the *Strickland* analysis. *Strickland* calls for an objective review of counsel's performance, and it makes no difference why counsel behaved as he did. The issue is whether his performance was substandard and whether prejudice resulted, regardless of the reason. The same can be said of Petitioner's argument that the trial judge's comments on certain aspects

of counsel's performance should be considered in evaluating that performance against the constitutional bar.

In sum, whether Petitioner's claims are viewed individually or collectively, they do not approach the deficient performance necessary to meet the first prong of the *Strickland* standard. Moreover, assuming that any of the portions of counsel's performance fell outside the wide range of reasonable professional assistance, Petitioner completely failed to show prejudice. His laundry list of errors does not create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052; *see Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (to satisfy *Strickland* test, petitioner must show that "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"); *United States v. Sutherland*, 929 F.2d 765, 774 (1st Cir.1991) (petitioner must show deprivation of fair trial with reliable result); *Scarpa*, 38 F.3d at 8–9. Petitioner's conviction was the result of strong circumstantial evidence that he had the motive and opportunity to murder the victim, not the result of his counsel's performance. Accordingly, Petitioner's claims of ineffective assistance of counsel do not warrant the writ of habeas corpus.

### III. Conclusion

For all of the reasons stated above, I recommend that Respondent's *motion to dismiss* be **ALLOWED** and that the Petition for the writ of habeas corpus be **DENIED.**

### IV. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete*, 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn*, 474 U.S. 140, 148–149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

July 7, 1999.